# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

MACARTHUR DAY,                          )
                                        )
                    Plaintiff,          )          Civil Action No. 3:10-454-JFA -JRM
                                        )
v.                                      )
                                        )
FRANK MORGAN, CONNIE                    )          **REPORT AND RECOMMENDATION**
LONG, ED ESTRIDGE, LEE                  )
WALKER, RONALD CHESTNUT,                )
LINDA HORTON, KCSD Kershaw              )
County School District,                 )
                                        )
                    Defendants.         )
_____)


*Pro se* Plaintiff, McArthur Day ("Day"), filed his complaint in this case after he was terminated by his employer, the Kershaw County School District ("the District"). Day also names several of the District's employees as Defendants ("the individual Defendants"). Defendants filed a motion for summary judgment on January 11, 2011.  Because Day is proceeding *pro se*, an order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) was issued on January 13, 2011, explaining to him his responsibility to respond to Defendants' motion for summary judgment.  Day filed a response on February 22, 2011, and a motion for summary judgment on March 9, 2011.[1] Defendants filed an opposition memorandum on March 23, 2011.

---

[1]Defendants filed motions to strike Day's Roseboro response and his motion for summary judgment because they were not timely filed.  Defendants are correct.  However, because the undersigned finds that Defendants are entitled to summary judgment after review of the entire record, the motions to strike will be denied by separate order.

Day does not plainly state his claims in his *pro se* complaint.  Defendants have deposed Day and, based on his deposition and the complaint, construe the complaint to allege:

1.  Violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, against the District (wrongful discharge and failure to accommodate);

2.  Worker's Compensation Retaliation against the District;

3.  Defamation, violation of constitutional rights, failure to accommodate, and disability discrimination by the individual Defendants.

Day does not disagree with Defendants' characterizations of his claims.

## Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact."  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19 (citing Anderson, 477 U.S. at 247-248).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

### Facts

The record shows that Day worked for the District for approximately two and a half years as a custodian, was assigned to several schools, and suffered several on the job injuries:

1.    At relevant times the following Defendants were employed by the District:

    a.    Dr. Frank A. Morgan ("Morgan"), Superintendent;

3

b.    Dr. Connie M. Long ("Long"), Assistant Superintendent for Human Resources; and

c.    Ed Estridge ("Estridge"), Executive Director of Maintenance, Custodial Services, and Facilities.

2.    Day was hired on March 8, 2006, and assigned to Doby's Mill Elementary School ("DMES").  While Day worked at DMES, Dr. Glenn Huggins ("Huggins") was Principal, Ginger Catoe ("Catoe") was Assistant Principal, and Joe Smith ("Smith") was head custodian and Day's supervisor. (Catoe Aff.).

3.    Day was counseled on several occasions for employment related issues while at DMES.  Huggins wrote Day on April 18, 2006 (Catoe Aff., Ex. A), May 2, 2006 (Catoe Aff., Ex. C), and June 15, 2006 (Catoe Aff., Ex. D) commemorating counseling and issues with Day. The last letter concluded "(s)hould you violate any of the directives as set forth in recent meetings or discussed in this correspondence, I will not hesitate to recommend that your employment with the District be immediately terminated."

4.    In June of 2006, Day was temporarily transferred to Camden Middle School and then to Wateree Elementary School ("WES"). (Long Aff.).

5.    In May of 2007, while working at WES, Day slipped on a wet floor and sprained his right ankle.  He was treated and returned to work without restrictions. (Long Aff.).

6.    Day was assigned to Pine Tree Hill Elementary School ("PTHES") for the 2007-2008 academic year.  (Long Aff.).

7.    While Day worked at PTHES, Lee P. Walker ("Walker") served as Interim Principal, Linda A. Horton ("Horton") was a teacher, and Ronald Chestnut ("Chestnut") was the

4

Head Custodian and Day's supervisor. (Long Aff., Walker Aff., Hortin Aff.). At PTHES, Day continued to generate performance issues and sustain further injuries:

a. On August 16, 2007, Day pulled a muscle in his right leg while cleaning a classroom. (Long Aff., Ex. I).

b. On August 24, 2007, Day visited his doctor with back pain. He was returned to work with restrictions of not lifting more than 20 pounds with no repeated bending. (*Id.,* Ex. J).

c. Day later presented two physician's assessments from the same doctor dated August 29, 2007. One continued restrictions and the other stated he could return to "full duty." (*Id.,* Ex. K).

d. On August 28, 2007, a teacher reported a confrontation with Day after she reported that her classroom had not been cleaned.  The teacher stated that Day "got into my space" and that the incident made her "very uncomfortable." (*Id.,* Ex. M).

e. On September 10, 2007, Day fell and injured his right leg and back while cleaning the cafeteria. (*Id.,* Ex. N).

f. Day saw his doctor on September 12, 2007, who released him to return to work with restrictions, including no lifting of more than 10 pounds, no climbing ladders, no repeated bending, no continuous standing, minimum walking and climbing stairs, and no overhead lifting. (*Id.,* Ex. N).

5

g.    During the month of September 2007, Day continued to visit his doctor and furnish the District with statements concerning his limitations. (*Id.,* Exs. O-Q).

h.    On October 3, 2007, Walker, her Assistant Principal, and Chestnut sent Day's doctor a complete job description for Day's position and asked that his doctor provide the District with "work status duty restrictions based on a re-evaluation to take place on October 4, 2007." (*Id.,* Ex. R).

i.    Day's doctor issued a return to work form on October 5, 2007, stating that Day could not climb ladders or perform overhead lifting. Other than those restrictions, Day could "work at usual job description at slower pace to allow for reconditioning. Allow opportunity to rest 5 minutes of each hour if needed." (*Id.,* Ex. S).

j.    On November 1, 2007, Day lost his keys to PTHES. This created a security issue. The keys were found the next day. (*Id.,* Ex. L).

k.    On November 5, 2007, a different doctor provided that Day would be out of work until further evaluation if he could not work "light duty" with specified restrictions. (*Id.,* Ex. U).

l.    On November 6, 2007, Day met with Walker and provided her with the November 5, 2007 return to work form. She informed Day that there were no light duty positions available and asked him to keep her informed of his ability to return to work. (*Id.,* Ex. T).

6

m.    On December 14, 2007, Long wrote Day summarizing his injuries, restrictions and work history from May 3, 2007 through November 6, 2007, the day of their meeting. She indicated that he had not reported to work nor provided an updated medical statement.  She sent him a "Certification of Health Care Provider Form" to be completed by his doctor and to be returned by January 7, 2008. (*Id.,* Ex. T).

n.    On December 19, 2007, Day obtained a statement from his doctor stating that he could return to work on full duty with no restrictions as of December 21, 2007. (*Id.,* Ex. V).

o.    Schools in the District were closed for the holiday break from December 21, 2007 through January 7, 2008.  On December 21, 2007, Long wrote Day acknowledging receipt of his doctors' statement that Day could return to work without restriction and instructing him to report for work at PTHES on January 7, 2008, and to meet with Walker to discuss his job expectations. (*Id.,* Ex. W).

p.    On January 7, 2008, Day returned to work at PTHES.  On that day he met with Walker, Chestnut, Estridge and Anthony Jones, the Transportation and Safety Officer. They discussed (1) expectations for Day's performance, (2) "schedules and review procedures essential to [Day's] continued employment," and (3) Day's responsibilities as a full-time custodian. Day was given written "Performance Concerns

7

and Expectations" as well as "Cleaning Specifications" for PTHES. (*Id.,* Exs. X and Y).

q.     On January 11, 2008, Walker wrote Day detailing deficiencies in his performance for the period of January 7 through January 10, 2008 based on inspections conducted by Chestnut and Walker. The need for "(s)ignificant improvement" was expressed and another meeting was scheduled for January 18, 2008. (*Id.,* Ex. Z).

r.     On January 14, 2008, Day telephoned Chestnut from a doctor's office and told him he was "hurting all over - back, leg, and head," and that he did not know when he would be able to return to work. Walker wrote Long to inform her of the situation. (*Id.,* Ex. AA).

s.     On January 17, 2008, Day obtained another return to work form from his doctor stating that he could return to work on light duty on that day with restrictions of no lifting over 5 pounds, no pushing or pulling over 5 pounds, no bending, stooping, or squatting, and limited walking. (*Id.,* Ex. BB).

t.     The District determined that there was no light duty position available to meet the restrictions. (Walker Aff. and Pl. Dep., p. 134). Day did not return to work after January 17, 2008. (*Id.*)

8.    Day sought to maintain his position with the District. It appears he applied for additional sick leave and long term disability benefits. (*Id.,* Ex. MM). Day also pursued worker's compensation benefits.

8

9.  Day went to the District office on March 19, 2008, to obtain forms or information concerning sick leave or disability. A staff member reported that Day stated that: (a) he could understand how an employee could be under so much stress that they could go into the workplace and shoot people; (b) he had to push family and friends away and seclude himself because of his anger due to the stress he was under; and (c) he did not want to spend his last days behind bars. (*Id.,* Ex. CC).

10.  The comments were reported to Long and she telephoned Day on March 19, 2008 and told him that he was placed on unpaid administrative leave until further notice. Day denied making the statements attributed to him. Long followed up the conversation with a letter further advising Day that an inquiry would be conducted to determine what further action would be taken and that, in the interim he was not to return to any District facility for any reason. (*Id.,* Ex. DD).

11.  Long met with Day and his wife on May 21, 2008. Estridge and Keith McAlister, Assistant Superintendent for Operations, were also present. Long followed up the meeting with a letter to Day on May 22, 2008, which stated that she was recommending termination to the Superintendent because her investigation and review of Day's record showed "misconduct, failure to follow policy and procedure, and poor job performance." Day was notified that he could appeal the decision to Morgan within 5 days. (*Id.,* Ex. EE).

12.  Day requested an extension on May 28, 2008, and Morgan wrote him on May 30, 2008 that he had 5 days from May 30 to appeal. (*Id.,* Exs. FF and GG).

13.  Day notified the District of his appeal on June 4, 2008. (*Id.,* Ex. HH).

14.   Day appeared at an informal hearing before Morgan on June 12, 2008.  Morgan wrote
      Day on that date, fully discussed the allegations and Day's position, and determined
      that Day should be terminated.  Day was notified that he could appeal to the District's
      Board of Trustees. (*Id.,* Ex. II).

15.   Day sought review by the Board of Trustees. (*Id.,* Ex. JJ).

16.   The decision to terminate Day was affirmed by the Board of Trustees on July 8, 2008.
      (*Id.,* Ex. KK).

## Discussion

### A.  Plaintiff's Motion for Summary Judgment

Day filed a motion for summary judgment on March 9, 2011.  Review of the motion and the documents attached show in reality that Day opposes Defendant's motion for summary judgment. He states that he signed a release giving Defendants access to his medical records and seems to argue that his medical records show that Defendants are not entitled to summary judgment.  Attached to his motion are a few medical records, the Kershaw County Incident Report from March 18, 2008 concerning the alleged threat reported to the Sheriff's office, correspondence, and a couple of unsworn statements from Day.  None of this complies with the standard for summary judgment discussed above.  Day's motion for summary judgment should be denied.  The material attached to Day's motion has been considered in the below discussion of Defendants' motion for summary judgment.

B. **Defendants' Motion for Summary Judgment**

1. <u>ADA</u>[2]

Day alleges that he was discharged because of his disability and that the District failed to accommodate his disability.[3] Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). The Act provides:

> No covered entity[4] shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). According to the Act the term "discriminate" includes:

---

[2]The ADA was amended in 2008 to more clearly define such terms as "disability" and "substantially limits." *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553. The amendments did not become effective until January 1, 2009, and Congress did not express its intent for these changes to apply retroactively. Although the Fourth Circuit has not expressly ruled on this issue, other circuits considering the issue have found that the 2008 ADA amendments are not retroactive. *See* <u>Thornton v. United Parcel Serv., Inc.</u>, 587 F.3d 27, 34 n. 3 (1st Cir. 2009): <u>EEOC v. Agro Distrib., LLC</u>, 555 F.3d 462, 469-70 n. 8 (5th Cir. 2009); <u>Milholland v. Sumner County Bd. of Educ.</u>, 569 F.3d 562, 565-67 (6th Cir. 2009); <u>Fredricksen v. United Parcel Serv., Co.</u>, 581 F.3d 516, 521 n. 1 (7th Cir. 2009); <u>Becerril v. Pima County Assessor's Office</u>, 587 F.3d 1162, 1164 (9th Cir. 2009); <u>Lytes v. DC Water & Sewer Auth.</u>, 572 F.3d 936, 939-42 (D.C.Cir. 2009). In a recent unpublished case, the Fourth Circuit noted that other circuits have found that the 2008 ADA amendments are not retroactive and found no reason to disagree with their conclusion. <u>Shin v. University of Md. Med. Sys. Corp.</u>, No. 09-1126, 2010 WL 850176, at *5 (4th Cir. Mar.11, 2010). The incidents alleged in this action took place before these amendments became effective.

[3]The individual Defendants are entitled to summary judgment insofar as Day has sued them under the ADA because liability under the ADA extends only to "employers." *See* <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462, 472 (4th Cir. 1999); <u>Sadler v. Tilley</u>, No. 2:05-cv-3234-MBS, 2007 WL 4292800, *6-7 (D.S.C. Dec. 4, 2007); <u>Alexander v. Q.V.C. Distribution Center</u>, No. 4:08-cv-32-F, 2008 WL 2620134, *1 (E.D.N.C. Jul. 1, 2008); <u>Collins v. Network Exp., Inc.</u>, 4:07-1564-RBH, 2008 WL 4280382, *7 (D.S.C. Sept. 12, 2008); and <u>Miller v. Ingles</u>, No. 1:09-cv-200, 2009 WL 4325218, *8 (W.D.N.C. Nov. 24, 2009).

[4]Defendants have not argued that they are not covered entities.

denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(B). A "reasonable accommodation" includes:

job restructuring, part-time or modified work schedules, reassignment to a vacant position ... and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

To establish a prima facie case of wrongful discharge on the basis of the ADA, a plaintiff must show that: (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met the employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.2001). To establish a prima facie case for failure to accommodate a disability under the ADA, a plaintiff must show that: (1) he was an individual who had a disability within the meaning of the statute; (2) his employer had notice of his disability; (3) with reasonable accommodation he could perform the essential functions of his position; and (4) his employer refused to make such accommodations. See Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

a. Wrongful Discharge

The District does not concede, but offers no argument, that Day meets the requirements of being within the ADA's protected class. The District concedes that Day was discharged, but argues that at the time of his discharge he was not meeting the District's legitimate expectations and that the circumstances of his discharge do not raise a reasonable inference of discrimination.

12

The record is replete with the District's well documented concerns about Day's job performance beginning at DMES and ending at PTHES. The concerns predated Day's first injury while working at WES and continued throughout his employment with the District. Day was warned by Huggins, Principal of DMES, that termination would be recommended if his performance did not improve. The record also shows that Day was counseled about his job performance on several occasions.

While Day's work history is relevant, the appropriate point to evaluate an employee's performance is at the time of the adverse employment action. Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005). Where the employee presents evidence that he met his employer's legitimate job expectations, the employer may counter with evidence defining those legitimate expectations as well as evidence of the employee's failure to meet those expectations. Odom v. International Paper Co., 652 F.Supp.2d 671, 683 n. 9 (E.D.Va. 2009) (citing Warch v. Ohio Cas.Ins.Co., 435 F.3d 510, 516 (4th Cir. 2006)). An employer's expectations are "legitimate" when they are not a sham, but honestly held. The employee's agreement with the employer's definition of "legitimate expectations" is not the test. Wells v. Briggs Const. Equipment, Inc., No. 3:08-3634-JFA-PJG, 2010 WL 2991673, *4 (D.S.C. May 12, 2010) citing Warch, at 518 and Thornley v. Penton Pub.Inc., 104 F.3d 26, 30 (2d Cir. 1997). So long as the employer's expectations are legitimate, it is the opinion of the employer as to whether the employee is meeting those expectations that controls. The employee's opinion that he was meeting the employer's expectations is insufficient to establish a prima facie case of discrimination. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) and Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-961 (4th Cir. 1996).

13

Day returned to work at PTHES on January 7, 2008 without restriction. Due to deficiencies in his past performance during which he was provided with written "Performance Concerns and Expectations" and "Cleaning Specifications," Day met with Long, Walker, Chestnut and Estridge on that date to discuss his future performance. As a result, Day's work was closely monitored by Walker and Chestnut during the week of his return. Day was advised of numerous, specific deficiencies. Day did not return to work after January 11, 2008. The evidence which is unrefuted by Day shows that his performance did not meet the District's legitimate expectations in his final week of work when he had no limitations.

As of January 17, 2011, Day's doctor limited him to light duty. Since this could not be accommodated (*see* discussion below), he remained out of work. It was during this time that Day allegedly made threats when visiting the benefits office. Day denied making the threatening statements, but after an investigation termination was recommended and ordered.

Day has failed to establish a prima facie case that he was discharged because of a disability. He was not meeting the District's legitimate work expectations. Further, the above discussion and the record show no circumstances that give rise to an inference of discrimination.

b. Failure to Accommodate

Defendants again state that Day has not established that he is a qualified individual with a disability under the ADA, but offer no real analysis. They argue instead that Day could not perform the essential functions of his job with reasonable accommodations.

The reasonableness of an accommodation is assessed objectively. *See* Petty v. Freightliner Corp., 122 F.Supp.2d 666, 668 (W.D.N.C.2000). The term reasonable accommodation means:

ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that

14

enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(i).

"Reasonable accommodations" may include "reassignment to a vacant position; acquisition or modifications of equipment or devices ..." 29 C.F.R. § 1630.2(o)(2)(ii). Employers may, at their discretion, accommodate employees beyond the mandate of the ADA. *See* Myers v. Hose, 50 F.3d 278, 284 (4th Cir.1995) ("[S]uch policies are not the definitive source of the standard by which reasonable accommodation is measured ....").

There is no evidence in the written record that Day ever formally requested an accommodation of his limitations other than presenting the restrictions listed by his doctors each time he returned to work. Day testified during his deposition that he requested accommodation from the District which was denied. The District denies that Day made the requests, and argues that even if the requests had been made and granted that Day would still not have been able to perform the essential functions of his job as custodian. Importantly, Day conceded during his deposition that he could not perform the essential functions of the custodial position due to his limitations. (Pl.Dep., pp. 89, 100-101, 135-137).

The job description for Day's position is a part of the record. It lists "Routine Daily Tasks" and "Cleaning Specifications." (Long Aff., Ex. R). Day testified that the District could have accommodated him by letting others assist him because he and two others were responsible for all custodial work. Day thought "(t)hey could have let the other two people done part of my job so, you know, so that the job could be completed for me." (Pl.Dep., pp. 89-90). However, "the ADA does

15

not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" Crabill v. Charlotte Mecklenburg Board of Education, Nos. 10-1539, 10-1553, 2011 WL 1491230, *8 (4th Cir. Apr. 20, 2011).

Day also claims that Defendants could have accommodated his physical limitations by promoting him to the position of head custodian at Lugoff-Elgin Middle School which would have required less exertion. (Pl.Dep., pp. 141-144). According to Defendants, this position was advertised in October of 2007. There is no indication that Day applied for the position, but he testified during his deposition that he asked Long and others for the transfer and promotion. (*Id.*)

Days argument fails because he has not shown he was qualified for the position of head custodian. Given Day's limitations in October of 2007 (*see* Long Aff., Exs. N-Q and S-U), he would not have been able to perform the essential functions of the head custodial position. The job description is a part of the record. (*Id.,* Ex. LL). It states in part:

> Physical Requirements: Must be physically able to operate a variety of machines and equipment including vacuum, buffer, lawn mower, hand and power tools, cleaning supplies, etc. Tasks involve the regular and, at times, sustained performance of moderately physically demanding work, typically involving some combination of climbing and balancing, stooping, kneeling, crouching and crawling, and that involve the lifting, carrying, pushing and/or pulling of moderately heavy objects and materials (20-50 pounds).

Under the ADA, an individual is "otherwise qualified" if he or she "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (42 U.S.C. § 12111(8)). (emphasis added). This coupled with Defendants' evidence of poor work performance leads to the conclusion that Day was not qualified for the position of head custodian. *See* Grey v. Potter, 2003 WL 1923733, *13 (M.D.N.C.).

16

Day also alleges that the District failed to provide him with requested equipment and limited his access to supplies. One of Day's job duties was to pick up litter and objects left on the school grounds. Day maintains that he requested the use of a golf cart or a riding lawn mower to assist him in this duty. According to Day, Estridge did not provide him with either the golf cart or the riding lawn mower. Estridge told Day to follow up with a maintenance employee, but Day failed to do so. (Pl.Dep., pp. 175-177). The District denies that Day made these requests. (Estridge Aff.). However, in the light most favorable to Day, the Court assumes they were made. Day does not state that the requests were denied, but that Estridge directed him to someone else whose name he (Day) forgot.

As mentioned above, the ADA may require an employer to provide a reasonable accommodation by the "acquisition or modification of equipment or devices" to enable a disabled person to perform the essential function of his job. It is not clear when Day requested the use of the golf cart and/or riding lawn mower. The undersigned assumes that it was between August and the end of December while Day worked at PTHES. During this period, Day received his most significant injury on September 10, 2007 and was able to return to work without restriction as of December 19, 2007. Between these two dates, Day was intermittently out of work, saw several doctors, and was given differing restrictions. The use of the golf cart and/or riding lawn mower would have accommodated Day's limited walking restrictions. However, Day was given other restrictions, such as limited lifting; no climbing of ladders; no or limited bending, stooping, squatting, pushing, jerking, twisting or bouncing; no continuous standing; minimum climbing (i.e., stairs); and no overhead lifting. (*See* Long Aff., Exs. N, O-Q, S and U). Even had Day been given access to a golf cart and/or riding lawn mower to help him maintain the school grounds, he has not shown that he would have been able to perform the other essential functions of his job given his multiple restrictions. Further,

17

at certain times Day was restricted from driving or operating hazardous machinery (*Id.,* Ex. O and P) making his ability to operate a golf cart and/or riding lawn mower problematic.

Day also asserts that his access to supply closets, classrooms and some building entrances was limited making it more difficult for him to perform his job. (Pl.Dep., pp. 170-173, 181). This was a security issue brought about by Day's loss of his master keys. He also complains that his request for gloves, knee pads, and a raincoat to use while pulling weeds was denied. However, it does not appear that weed eradication was an essential function of his position.

Day has not shown that he could have performed the essential functions of his job if he had been given all the accommodations he requested.

### 2. Constitutional Violation

Day asserts that his constitutional rights were violated when Long wrote him and told him he could not return to PTHES. Long wrote Day on March 19, 2008, and told him that he "could not return to any District facility for any reason" during the pendency of the investigation concerning his alleged threatening remarks of March 18, 2008. (Long Aff., Ex. DD). Long also wrote Day on May 22, 2008, after the investigation, and advised him that he was "not to return to Pine Tree Hill Elementary School for any reason without prior expressed permission from the Superintendent or me." (Long Aff., Ex. EE). According to Day, the latter restriction would prohibit him from voting or attending PTA meetings at PTHES.

Title 42 U.S.C. § 1983 provides a remedy to those whose constitutional rights have been denied by a person acting under color of state law. The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Under § 1983, a plaintiff must meet three requirements to bring suit in federal court. He must show that he was deprived of a right guaranteed by the Constitution or laws of the United States, by a "person," who was acting "under color of" state law.

Day does not state exactly which constitutional right was violated by Long's letters. In any event, it is clear the authorities have the right to maintain security at public schools:

> School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property. *See, e.g.*, Carey v. Brown, 447 U.S. 455, 470-71, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (the Constitution does not leave state officials powerless to protect the public from threatening conduct that disturbs the tranquility of schools); Goss v. Lopez, 419 U.S. 565, 582-83, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (a school official's determination of the existence of an ongoing threat of disruption of the academic process can justify immediately removing a person from school property). While the specific contours of the authority and responsibility of school officials are defined by state law, such officials should never be intimidated into compromising the safety of those who utilize school property. *Cf.* Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (public education is by and large committed to the control of state and local authorities); Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14, 822 F.2d 747, 751 (8th Cir.1987) (in determining the invalidity of a First Amendment violation claim, the "restraint [applies] only on [high school] property. The difference is decisive.").

(Lovern v. Edwards, 190 F.3d 648, 655-656 (4th Cir. 1999).

Further, Defendants are entitled to qualified immunity. Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The analysis of the defense of qualified immunity is generally examined using a two-step analysis. *See*

19

Saucier v. Katz, 533 U.S. 194, 201 (2001).[5]  The first step is to determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants' conduct violated a constitutional right.  *Id.* at 201.  If the facts, so viewed, do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity."  *Id.*  If, however, a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense.  *Id.*  If the right was not clearly established, the defendants are entitled to qualified immunity.  *Id.*

Defendants are entitled to qualified immunity, as Day fails to establish the violation of a constitutional right.  He has not identified a specific constitutional right violated by Long's letters or that such a right was clearly established.

### 3.   Retaliatory Discharge in Violation of S.C..Code Ann.§ 41-1-80

To prove a claim under S.C.Code Ann. § 41-1-80,[6] the plaintiff must establish three elements: 1) institution of workers' compensation proceedings; 2) discharge or demotion; and 3) a causal connection between the institution of the workers' compensation proceedings and the employment action.  Hines v. United Parcel Service, 736 F.Supp. 675 (D.S.C.1990).

---

[5]The Supreme Court has clarified that these steps do not need to be taken in the sequence set forth in Saucier, and that
> [t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand.

Pearson v. Callahan, 555 U.S. 223 (2009).

[6]In relevant part, § 41-1-80 provides:
> No employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law (Title 42 of the 1976 Code), or has testified or is about to testify in any such proceeding.

The appropriate test of causation under the workers' compensation retaliatory discharge statute is the "determinative factor" test, which requires that the employee establish that he would not have been discharged "but for" the filing of the workers' compensation claim. Hinton v. Designer Ensembles, Inc., 343 S.C. 236, 540 S.E.2d 94, 97 (S.C.2000). "The ultimate burden of persuasion never shifts and the employee bears the burden of persuasion that the reason given for termination was pretextual." *Id.* (emphasis in original).

Day asserts that he was discharged because he filed a claim under the Workers' Compensation Act. (Pl.Dep., p. 162). The record shows that Long recommended Day's termination on May 21, 2008, and that the Board of Trustees affirmed the termination on July 28, 2008. However, Day did not file his claim with the Workers' Compensation Commission until August 29, 2008. (*See* claim attached to Defendants' reply brief). Day cannot meet the above standard because his claim was filed after his termination. *See* Hines, 736 F.Supp. at 677-678 (Dismissing a worker's compensation retaliation claim reasoning "(e)ssential to a claim under this statute is proof that the employee instituted or caused to be instituted proceeding for recovery of worker's compensation benefits before she was terminated) (emphasis in original)).

4. Defamation

Day appears to assert a claim under South Carolina law for defamation against Long and Horton. According to Day, Long defamed him by reporting his alleged threats to the police and placing false information in the letter to him advising him that she was recommending that he be terminated. Day also asserts that Horton, a teacher at PTHES, defamed him by giving an account different from that he gave concerning his slip and fall in the cafeteria at PTHES in September of 2007.

Under South Carolina law, the tort of defamation provides redress for an injury to reputation due to the defendant's communication to others of a false statement about plaintiff. The elements are: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Fleming v. Rose, 526 S.E.2d 732 (S.C.Ct.App.2000), *rev'd on diff. grounds*, 567 S.E.2d 857 (2002).

Defendants Long and Horton assert that they are entitled to a qualified privilege concerning their statements. The South Carolina Supreme Court summarized this issue in Swinton Creek Nursery v. Edisto Farm Credit, 514 S.E.2d 126, 133-134 (S.C.1999):

> In a defamation action, the defendant may assert the affirmative defense of conditional or qualified privilege. Under this defense, one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused. Restatement (Second) of Torts § 593 (1977); *see* Bell v. Bank of Abbeville, 208 S.C. 490, 38 S.E.2d 641 (1946). In Bell, this Court held:
>
> > In determining whether or not the communication was qualifiedly privileged, regard must be had to the occasion and to the relationship of the parties. When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion. The statement, however, must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed. Bell, 208 S.C. at 493-94, 38 S.E.2d at 643 .....
>
> In general, the question whether an occasion gives rise to a qualified or conditional privilege is one of law for the court. 50 Am.Jur.2d Libel and Slander § 276 (1995). However, the question whether the privilege has been abused is one for the jury. *Id.* Factual inquiries, such as whether the defendants acted in good faith in making the statement, whether the scope of the statement was properly limited in its scope, and whether the statement was sent only to the proper parties, are generally left in the hands of the jury to determine whether the privilege was abused. *Id.*; *see also* Restatement (Second) of Torts §§ 599-610. In Fulton [v. Atlantic Coast Line R.R.,

220 S.C. 287, 67 S.E.2d 425 (1951) ], this Court held that it was a question for the jury to determine if the publication went beyond what the occasion required and was unnecessarily defamatory. Fulton, 220 S.C. at 297, 67 S.E.2d at 429; *cf.* Woodward, 277 S.C. at 32-33, 282 S.E.2d at 601 ("While abuse of privilege is ordinarily an issue for the jury, ... in the absence of a controversy as to the facts ... it is for the court to say in a given instance whether or not the privilege has been abused or exceeded.").

The Defendants must establish that it made a communication in good faith on a subject in which it has an interest or duty to a person with a corresponding interest or duty. Constant v. Spartanburg Steel Prods, Inc., 447 S.E.2d 194 (S.C.1994). Here, Defendants have established a common interest in the subject as they were attempting to protect the interest of PTHES and the District. Generally, communications between corporate officers and employees are granted qualified immunity if they are made in good faith and in the usual course of business. Conwell v. Spur Oil Co., 125 S.E.2d 270, 275 (S.C.1962). Day has offered no proof or argument that defendants abused the privilege.  Because the statements made by Long and Horton occurred during the course of the business of PTHES and the District, they are entitled to qualified privilege.  Therefore, Day's defamation claim must fail.

### Conclusion

Based on a review of the record, it is recommended that Plaintiff's motion for summary judgment be **denied**, and Defendants' motion for summary judgment be **granted**.

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina
May 5, 2011

**The parties are referred to the Notice Page attached hereto.**

23

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).